## UNITED STATES v. HOXSEY CANCER CLINIC et al.

### No. 13645.

United States Court of Appeals
Fifth Circuit.

July 31, 1952.

Rehearing Denied Sept. 10, 1952.

William W. Goodrich, Acting Asst. Gen. Counsel, Food & Drug Division, Washington, D. C., James M. McInerney, Asst. Atty. Gen., Frank B. Potter, U. S. Atty., Fort Worth, Tex., Vincent A. Kleinfeld, Atty., Dept. of Justice, Washington, D. C., Bernard D. Levinson and Joseph L. Maguire, Attys., Federal Security Agency, Washington, D. C., of counsel, for appellant.

Herbert K. Hyde, Oklahoma City, Okl., James H. Martin, Dallas, Tex., for appellees.

Before HUTCHESON, Chief Judge, and RUSSELL and RIVES, Circuit Judges.

RUSSELL, Circuit Judge.

Proceeding under the provisions of the Federal Food, Drug and Cosmetic Act,[1] and relying particularly upon its provisions defining labeling,[2] prohibiting introduction into interstate commerce of any drug that is misbranded,[3] and deeming a drug misbranded "If its labeling is false or mislead-

1. 21 U.S.C.A. § 301 et seq.

2. 21 U.S.C.A. § 321(m).

3. 21 U.S.C.A. § 331(a).

274

ing in any particular",[4] the United States sought in the trial Court the injunctive relief provided by the Act[5] to prevent the Hoxsey Cancer Clinic, and Harry M. Hoxsey, from introducing or delivering for introduction into interstate commerce bottles of brownish-black, and pink, colored liquids intended for use in the treatment and cure of cancer in man. It is alleged that the drugs, which are distributed and dispatched to physicians, practitioners, and other persons, by defendants are misbranded, because their labeling, specifically a booklet accompanying them, contains "general and specific statements which represent and suggest that said drugs are efficacious in the treatment, mitigation and cure of cancer in man, which statements are false and misleading since said drugs are not efficacious in the treatment, mitigation and cure of cancer in man." Two substantially similar booklets are involved, though it appears that one is no longer used.

For the establishment of its claims of general false and misleading statements, the Government relies upon the import and effect of statements made in an address, captioned: "Theory and Application of the Hoxsey Method of Treating Cancer," by "J. B. Durkee, D. O., Medical Director of the Hoxsey Cancer Clinic, Dallas, Texas, before the Second Annual Convention of the National Medical Society October 17, 1947 held at Royal Palms Hotel, Los Angeles, Calif.", reprinted in the booklets, as well as other statements and representations of the booklets which represent that the Hoxsey medicines are effective in the cure, mitigation, or treatment of internal cancer.

The claim of specific misrepresentations is predicated upon the contention that a division of the contents of the booklet, which includes the listing of individuals with their post office address and statement of the portion of the body on which the cancer appeared, reprint of proceedings and testimony of patients thereupon given, "before and after" treatment photographs and comment thereon, and the invitation to write to the individuals listed "requesting

first hand testimony regarding our treatment" when read in conjunction with the statement " 'we wish only to present the facts and records of results and benefits received by those who have taken our treatment' * * * leaves the clear representation that the persons named were cured of cancer by the Hoxsey drugs." The truth is said to be that "any of these specific representations are downright falsehoods."

The defense, in the trial Court by pleading and testimony, and renewed here by argument and brief, challenges each and all of the Government's contentions. The position of the defendants is that, as to the claim of general representations, the contents and statements of the booklets, considered as a whole, expressly deny that the medicines will cure all cases, but only that they cure some, do not cure some, and "relieve some somewhat." As to the specific charges of misbranding, the defendants' argument is mainly that by use of the word "patients" in reference to the individuals listed in the booklet there is removed any idea that such persons have been cured. However, it is further contended that the testimony does show that many of the listed individuals were successfully treated and, in some instances, cured. Underlying the entire argument is the fundamental contention that the medicines in question are efficacious in some instances in the cure and alleviation of cancer, and that they represent a "revolutionary treatment", which is, in many cases, successful. Running through the entire defense is the claim that the medicines and supportive treatments produce a higher percentage of more satisfactory results in the treatment of cancer than is secured by the other methods of treatment more generally employed of either x-ray, surgery, radium, or, in some instances, use of some of the by-products of atomic bomb production. These so-called orthodox methods are criticised as ineffective and in some cases positively harmful, whereas defendants contend their treatment does not have such harmful results and yet secures a higher percentage of cures.

4. 21 U.S.C.A. § 352(a).

5. 21 U.S.C.A. § 332.

The issues thus arising are still present here and require for their solution determination of what representations, general or specific, the booklets may fairly and reasonably be determined to make in the circumstances to which they relate and to the persons to whom they were made, and whether, as so construed and found, the representations are false and misleading within the terms of the statute. Implicit in the latter, and actually controlling here, is whether the Government maintained either or both of its positions that the medicines in question were not efficacious in the cure of cancer in man, and that, in any event, assuming that its claim of specific representation had been established, it had proved such representation to be false.

The trial Court made findings of fact and entered conclusions of law,[6] and, upon the ultimate ground that under the testimony as a whole the Government had failed

6.
"Findings of Fact.

1.
"The respondent did forward in interstate commerce to physicians in other states who had been present at the Hoxsey Clinic and studied its methods and efficacy for a considerable time, and were using such medicines and prescriptions in their similar treatment.

2.
"That accompanying such shipments were booklets containing the statements and illustrations quoted in the pleadings of both complainant and respondents.

3.
"That the respondents' treatment is not injurious. Some it cures, and some it does not cure, and, some it relieves somewhat. That respondents do not guarantee to cure.

4.
"That the statements contained in said labels so pleaded, are neither false nor misleading. That if in doubt as to the effectuality of the treatment, they take the patient on trial, and frequently, without charge to the patient.

5.
"That the percentage of efficient and beneficial treatments by respondents is reasonably comparable to the efficiency and success of surgery and radium, and and without the physical suffering and dire consequences of radium, if improperly administered, and surgery, if not successful in completely removing the entire malignant portion.

6.
"That cancer is an aggregation of outlaw cells with the propensity to migrate and grow in size and in the territory covered and the definite destruction of the body, or, a serious portion thereof.

7.
"That the respondents do have two basic medicines to which are added, if and when the examination of the patient calls for such additions, a large number of drugs and mitigations in separate a room at the clinic. (sic) That it also subtracts and changes the basic elements of the two medicines as indicated, in the judgment of the Medical Director of the clinic when indicated by the examination of the patient, but that no such prescription accompanies shipments made in interstate commerce to the doctors in other states who are using the Hoxsey method, nor does the same appear upon the bottles or receptacles of the medicine.

8.
"That the Food and Drug inspectors seized medicines and pamphlets and booklets such as are pleaded, from the doctors in other states who have been using the Hoxsey method, and which came interstate commerce. That such seizures were prior to the institution of this suit, since which time the respondents have made no interstate shipments of either pamphlets, or, medicines.

"Conclusions of Law.

"It is not necessary that mislabeling, or, misbrandings within the meaning of the Act shall actually be on the container, but they may accompany it, or, reach the user in some other manner. There is some authority to the contrary, but I think the case of Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52, and the case of United States v. Urbuteit, 335 U.S. 355, 69 S.Ct. 112, 93 L.Ed. 61, are controlling.

"The exemptions provided for in the Act with reference to physicians' prescriptions, and the placing of the contents on the bottle, or, container, are not applicable, nor can they be of any use to the respondents here, because the respondents' method in forwarding articles and pamphlets to the physicians in other states who were using the method and treatments were not so displayed. Nor can the plea of good faith, or, the charitable inclinations of the respondents save them from the rigors of the Act. Nor can the discontinuance of the practice of shipments to physicians in other states, save the respondents from the injunctive features of the Act, even though

to show the correctness of its charges, concluded that the injunctive relief sought should be denied.

The Government, as appellant here, strenuously insists that the trial Court's findings and conclusions evidence misapprehension of the legal effect of the competent evidence, as well as failure to apply the controlling law. It is urged that the competent evidence in the case presents undisputed proof of the Government's specific charges of misbranding which entitled the Government to a decree in its favor; that the Court's findings were erroneously induced by consideration of, and reliance upon, incompetent testimony from laymen that they had cancer; and that they were cured; and that the controlling finding by the trial Court that the Hoxsey drugs are not falsely represented as cancer cures and that they do cure cancer are clearly erroneous, should be set aside, and the issuance of an injunction directed by this Court. Appellees relying upon the Court's finding that the treatment "cures some, and some it does not cure, and some it relieves somewhat. That respondents do not guarantee to cure", cite it as confirmation of the finding that the representations of the booklet are neither false nor misleading.

Our consideration of the booklets, which concededly constitute the labeling referred to by the statute,[7] leaves us in no doubt that as concerns the nature and extent of general representation the content and statements of the booklet are intended to, and do, convey the claim that the Hoxsey medicines present a successful cure for cancer in only some cases, but the recitation of their virtues is so emphasized and reiterated as to induce in the mind of one thinking he suffered from cancer a belief that he had an excellent chance to be one of those cases in which the medicine would be successful. The language and entire contents are so hedged about with denials that the treatment is a "cure-all", or effective in all cases, that its true import is only that the medicines are effective in a substantial number of cases. For the purpose of this decision, and in determining the truth of such representations, we will accept the more restricted position, to which the Government is driven, that the precise extent of successful cures is immaterial since, it is contended, that the representation that *any cure* can be effected by use of the medicines is false and misleading. We think the claim of specific representation that the parties listed and given as references for testimonials is sustained to the extent claimed by the Government. It is difficult to imagine that one thinking himself inflicted with the dire disease of cancer and reading and considering the references to these listed patients, and the testimony there set forth, and which is prefaced as this is[8] and reiterated by conclusion,[9] would reach any other conclusion than that the persons listed were cured of cancer by

---

the Chancellor, speaking in equity, will not require that which is useless.

"Nevertheless, the facts disclosed by the testimony and found as above, as well as the failure of the government to successfully carry the burden and show a preponderance of the testimony, the correctness of its charges, merits, and must have, a refusal of the injunctive relief sought, and a dismissal of the bill, and such order and decree is, accordingly, announced."

7. Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52; United States v. Urbuteit, 335 U.S. 355, 69 S.Ct. 112, 93 L.Ed. 61.

8. "We are not going to use printed space for testimonial letters as is the usual custom, however, you will find a list of patients following, with cases no doubt paralleling your own. We are giving you their names and addresses. If you will write, enclosing a self-addressed, stamped envelope we feel you will receive a testimonial first-hand."

9. "Space does not permit us to give a complete list of all our patients, therefore, we have selected the above cases for the reason that they represent a cross section of the various types of patients treated at this instituion.

"You will no doubt find in this list a condition similar to that with which you or some member of the family are afflicted. We would suggest that you correspond with some of these patients, enclosing a self-addressed envelope, requesting first-hand testimony regarding our treatment."

the Hoxsey drugs. It is common knowledge that such is the representation of "testimonial letters as is the usual custom." It is clear that the general representation is that at least the Hoxsey medicines will cure some cancer, and the specific representation is that it has cured the persons listed as patients, and who have testified as to cure, and to whom it is suggested letters be addressed to obtain testimonials to the efficacy of such medicines. The question of whether these representations are false and misleading remains.

In approaching this question we are guided by some well recognized beliefs and experience so universally entertained and accepted by the practically unanimous aggregate of medical science as that contradiction thereof does not raise a substantial issue of fact. Thus, with practical unanimity, those informed and in position to know are of the firm belief that there is only one reliable and accurate means of determining whether what is thought to be cancer is, in truth and fact, actually cancer. This requires a biopsy, a microscopic examination of a piece of tissue removed from the infected and questioned diseased region. From this it follows that the opinion of a layman as to whether he has, or had, cancer, or a like opinion as to whether he has been cured and no longer bears the disease, if, in fact, it ever actually existed, is entitled to little, if any, weight. It is further true that despite the vast and continuous research which has been conducted into the cause of, and possible cure for, cancer the aggregate of medical experience and qualified experts recognize in the treatment of internal cancer only the methods of surgery, x-ray, radium and some of the radio-active by-products of atomic bomb production. This is so even though the ghastly truth is that these methods frequently fail and are, in many cases, themselves unsatisfactory. But it is true, nevertheless, that with present enlightenment they are our sole defense against the scourge of cancer. We think this statement evidences no acceptation of any particular school or segment of qualified expert medical opinion and belief, though it is not to say that persons activated by self-interest or ignorance may be found to express a contrary opinion. It is to say, however, that upon such subjects a Court should not be so blind and deaf as to fail to see, hear and understand the import and effect of such matters of general public knowledge and acceptance, especially where they are established by the overwhelming weight of disinterested testimony as appears in the record now before us.

Two liquid medicines which are shown to have been distributed by the defendants in interstate commerce for use in treatment of cancer are involved in this action.[10] One is a black, or brownish-black mixture; the other a pink medicine. Their respective formulae are neither secret nor contested. The analysis of samples of the drugs showed that the proportion of ingredients of the black medicine varied, but contained potassium iodide and extracts, (omitting the scientific names), from prickly ash bark, buckthorn, red clover blossom, alfalfa, and cascara sagrada. The pink medicine contained potassium iodide and lactate of pepsin. These drugs are shipped in 16 ounce bottles, to patients in diluted form, and to osteopaths in concentrated form with direction to add enough water (in case of the black), or elixir of pepsin (in case of the pink), to make a gallon. Illustrative analyses of the dilution are: water, 62 per cent, potassium iodide, 26.4 per cent, plant extractives, 7.9 per cent, mineral matter other than potassium iodide, 6/10ths of 1 per cent, and licorice flavoring; another, water 53.2 per cent, alcohol, 5.1 per cent, su-

---

10. Throughout the booklets referred to, and in the testimony, there are references to external, or skin cancers also. The defendants, in addition to the liquid medicines for the treatment of internal cancer, also have an escharotic treatment for external, or skin, cancer. This consists of a corrosive or caustic substance the basic ingredient of which is arsenic. The government makes no contention as to this medicine, or with reference to external cancer, and consequently this medicine and the question of its use and efficacy in the treatment and cure of external cancers, and, in fact, the entire subject of external cancers is not here involved.

gars, 12.6 per cent, potassium iodide, 29½ per cent, and the presence of pepsin; another water, 94½ per cent, potassium iodide, 4½ per cent, plant extractives, %₁₀ths of 1 per cent, and the presence of a licorice like flavoring; another, water, 76 per cent, alcohol, 7.2 per cent, sugars, 15 per cent, potassium iodide, 1.3 per cent and the presence of pepsin, and this was a "slightly acid preparation." The source of supply is the Hoxsey Cancer Clinic in Dallas, Texas. The defendant, Harry M. Hoxsey, is not a doctor, but a layman. It is his claim that the Hoxsey cancer drugs were originated by his grandfather about 1840 in Kentucky; were later used by his son, the defendant's father, and after the defendant's father's death in 1919 the present Mr. Hoxsey carried on the treatment and preparation of the drugs at the clinic, which was in charge of a doctor. The present director is Dr. J. B. Durkee, a doctor of osteopathy. The clinic operates through osteopaths and the drugs may be obtained from the clinic in Dallas, or from osteopaths in other states who have obtained the medicines by shipments from the clinic. The clinic does not maintain hospital facilities and patients who go there for treatment take the medicines away with them for self-administration. Supplies are replenished by shipments of the medicines to them.

Upon the trial the Government, after establishing the interstate shipments of drugs and booklets, and testimony as to the formulae and analyses of the drugs in question, introduced the testimony of highly qualified and experienced experts as to the pharmacological and pathological reaction and effect of the drugs in the Hoxsey medicines. Dr. David I. Macht, a physician specializing in pharmacological and experimental therapeutics, with impressive qualifications, who has done work on potassium iodide and emodin bearing drugs such as cascara sagrada and buckhorn, testified that potassium iodide could cause untoward reactions in most people. The amount received from the black medicine, when taken as recommended, could cause damage in some people. There is no basis for therapeutic use of the drugs found in the medicines,

or any combination of them in the treatment of cancer. A pathologist, Dr. Max A. Goldzieher, likewise qualified and experienced in his specialty, had conducted extensive research in cancer and in connection with his research had studied and experimented in the use of potassium in cancer in afflicted animals and also upon a group of 27 volunteer patients, all of whom were "very far gone, inoperable and obviously incurable cases of cancer." From these studies and experiments, he concluded that potassium increases the rate of growth in cancer and is not advisable in cancerous patients. It was his opinion, based upon such experiments, that the result of a patient with a malignant growth taking a daily dose as prescribed of the Hoxsey medicine would be to speed the growth of the cancer. Testimony was also presented of a controlled laboratory experiment carried out at the Jackson Memorial Laboratories, Bar Harbor, Maine, an institution engaged in the fundamental research of the biology of cancer, to show the effects of both types of Hoxsey medicine in treating cancerous mice. The physicians and scientists participating in the test possessed superior qualifications and extensive experience in such matters. It is shown that the manner and method of such experiments was in accordance with the best known and accepted practice and was applicable to the treatment of cancer in humans to the extent that "those agents which have been shown to produce beneficial effects against cancer in man, in general have been—they produce definite beneficial effects in some cancer on experimental animals." The Hoxsey medication had no beneficial therapeutic effect on the cancer of the afflicted mice. It was testified by Dr. R. L. Clark, an expert of superior qualification and experience, that the recognized and only accurate method of diagnosing cancer is by a biopsy examination of the tissue, made by someone who has made a special study of the process. He stated that he knew of no medicine taken orally that would cure cancer, and he considers that there are two different methods of curing cancer known today, "one of them is by removing the tumor by surgery,

generally, and the other one is by using radiation therapy, which constitutes x-ray, radium, and more recently some of the products, by-products, of the atomic bomb production." This witness was one of five directors and medical consultants at the Atomic Energy Plant at Oak Ridge, Tennessee.

Against this background the Government developed its case by presenting testimony in the form of case histories of sixteen persons who had taken the Hoxsey medicine for treatment of internal cancer. Nine of these persons are among those listed in that part of the booklet which we have held to constitute specific representations of cure. We shall not undertake to lengthily detail the voluminous evidence. It followed the general pattern of showing physical examination, the making of the biopsy and pathological examination of the tissue, and dependent upon the facts in the particular case, that, where actual malignancy was present it was neither retarded nor cured by the use of the Hoxsey medicines; or there was in fact no malignancy; and that certain of the persons who had cancer were operated on for cancer, or died, while taking the Hoxsey treatment; that one patient with cancer declined surgery, used the Hoxsey medicine, but died of cancer; and one regressed while taking the medicine but improved with subsequent x-ray therapy. Each of these critical circumstances was shown by the testimony of examinations, diagnoses and result by medical doctors, pathologists, and scientific examination, all had and done in accordance with the generally accepted and approved methods and means of ascertaining and determining the facts in such instances. If such testimony be accepted as credible, it clearly establishes the Government's contention that the Hoxsey drugs in question are not efficacious in the treatment, mitigation and cure of cancer in man, contrary to the general representation of the booklet, and that the specific representation as to nine of those persons listed by name in the booklet are not true in that such persons were not cured of cancer by the use of such drugs.

The defendants countered the case of the Government with testimony as to twenty-two cases of claimed cancer cure, as well as the testimony of three osteopaths, Dr. Durkee, the director of the clinic, Dr. Macauley, a general practitioner of Jefferson City, Missouri, and Dr. Downs of Denver, Colorado. Mr. Hoxsey did not testify. Eleven of the twenty-two cases concerned alleged cancer of the skin and the result of the use of the Hoxsey powder and salve. Some of these also took the internal medicine, though it is not shown that this had any effect upon the alleged cancer and the testimony is to the effect that the powders and salves were escharotics which destroyed the cancer tissue, as well as the normal tissue. In any event, the Government made no charge with reference to the powder or salve or to external or skin cancer, and contends here, correctly we think, that these eleven cases were irrelevant to the question in issue, which dealt solely with the efficacy of the black and pink drugs taken orally for the cure of internal cancer. In three of the remaining eleven cases of alleged cancer cure the only evidence that the patient actually had cancer when he went to the clinic was the testimony of the witness. Each of these was a patient at the clinic prior to the beginning of Dr. Durkee's employment there in 1946. Over the objection of the Government, they were permitted to testify that they had cancer. In the cases of four of the eight remaining alleged cancer cures the Government introduced medical testimony of doctors who had treated and operated on the patients to show that the cancerous condition had been successfully treated before the patient went to the Hoxsey Clinic. In three of these cases the absence of malignancy was shown by pathological examination. After apparent cure, these patients went to the Hoxsey Clinic and took the liquid medicine. In one of the cases within fifteen days after the negative result of the biopsy examination had been ascertained, Dr. Durkee, without a biopsy, stated he found cancer. In the four remaining cases the patients were likewise permitted to testify that they had cancer, or had been told that they had cancer, but there is no evidence of biopsy, and any proof of the nature of the disease these patients suffered is

dependent upon the diagnosis and testimony of Dr. Durkee. Under these circumstances, the Government contends that in no instance is there reliable scientifically acceptable evidence that the patient had a cancer when the Hoxsey medication was instituted. Dr. Macauley had practiced his profession since 1941 and had spent approximately a year at the Hoxsey Clinic. He admitted that he is not a cancer expert. He conceded that the only proper method of diagnosing a cancer is to make a biopsy and pathological examination of the tissue. Dr. Downs testified to the same effect. Dr. Durkee testified that he did not "need a biopsy to make a diagnosis of cancer." Substantially his entire experience and practice with cancer has been at the Hoxsey Clinic where during the past five or six years he has personally examined or treated five or six thousand patients. He personally examines all of the patients, seeing thirty-five to fifty a day, and spending between five and ten minutes with each on the average, though with some longer than others. Of this number, he estimates he has taken between three and four hundred biopsies. Not many were made of patients by other people at his request.

The above restricted summaries are not stated in an attempt to review in detail a voluminous record, but to show the general nature of the case put forward by the plaintiff and the defendant and to point up the difference in the type of proof presented by the Government to establish the allegations of the complaint, and the type of proof relied upon by the defendant to cast doubt upon the Government's case as thus presented.

Based upon the claim of supremacy of scientific testimony and pathological examination over the opinions of lay witnesses that they had cancer and were cured, or their hearsay testimony of what doctors had told them of their condition, and likewise over the testimony of Dr. Durkee, who, it is contended, was not only a vitally interested witness, but also without sufficient qualifications as an expert, the Government contends that as to the nine instances of specific misrepresentations its evidence is actually undisputed and requires a decree in its favor. It is also contended that it was prejudicial error for the trial Court to permit laymen to testify that they had, or were cured of, cancer, or as to what a physician had told them as to their condition. The third major contention of the Government is that the trial Court's findings that the Hoxsey drugs are not falsely represented as cancer cures and that they do cure cancer are clearly erroneous.

We have already stated the effect we think proper to give to the general and specific representations set forth in the booklets, the labeling of the drugs. Our consideration of the record and the nature of the issues involved has led to the firm conclusion that the trial Court's findings of fact that the representations in the labeling were neither false nor misleading, and that the brownish-black and pink colored medicines were efficacious in the cure of cancer in man are clearly erroneous. Thus, even if it be assumed, *arguendo*, that there is *some* measure of conflict in the evidence relating to the falsity of the specific representations referred to above, still, it is clear that a finding that such representations are true is not supported by substantial evidence. It is equally clear that, without regard to any general rule of admissibility of the testimony of laymen as to the existence of disease or physical injury, or as to the curative effect of drugs,[11] when the subject of investigation is the existence of cancer, the personal testimony of the lay sufferer is entitled to no weight, since the overwhelming preponderance of qualified opinion recognizes that not even the experts can assuredly diagnose this condition without the aid of biopsy and pathological examination. Hearsay testimony of what such a person has been told by a physician is entitled to no greater weight. Except for such testimony and

11. Cf. United States v. 141 Bottles of Drug Products, S. D. Texas, not reported, affirmed in Hall v. United States, 5 Cir., 267 F. 795; Federal Trade Commission v. Kay, 7 Cir., 35 F.2d 160, 162.

the testimony of the three osteopaths, two of whom did not claim to be experts on the diagnosis and treatment of cancer, and the third of whom is a definitely interested witness who testified as to ability to diagnose contrary to all accepted scientific knowledge, the testimony on behalf of the Government in the full and complete establishment of its case of misbranding is not substantially disputed. We think this so-denominated conflicting evidence is wholly insufficient to cast such doubt upon the testimony adduced in behalf of the Government as to authorize the trial Court to find that the Government had failed to carry the burden of establishing the truth of the allegations of its complaint. To the contrary, we think that the evidence in this case, considered as a whole, should, and must, induce a conviction that the finding of the trial Court that the representations were neither false nor misleading is so "against the great preponderance of the credible testimony that it does not reflect or represent the truth and right of the case." [12] On the entire evidence we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746. We recognize, as we must, that the cause, effect and cure of cancer are so obscure and indefinite that there obtains in the entire subject an area of the unknown. It is nevertheless the duty of a Court in making determination of questions of such great public moment as those which now confront us to give weighty consideration to the experience of the past and the accepted views and findings of science as held and confirmed by such experience and as likewise shown by the weight of the testimony to be applicable to the specific facts of this case. In this, as in other similar matters, that not all, or even little, is known about the subject does not require us to disregard that which is known and established. We do not have for consideration the merits even of any claimed newly discovered, or secret, drug or cure. The case involves the efficacy of only well known drugs. As a cure for cancer these have been weighed and found wanting.

It was not necessary for the Government to prove that each and every representation in the booklet was false or misleading. The statute seeks to prevent labeling which is false or misleading in any particular. Proof that such representation in the case of at least nine of the persons represented as cured was false establishes the falsity of such representation in a most significant particular. Furthermore, as we have held, the overwhelming weight of the credible evidence requires a conclusion that the representation that the Hoxsey liquid medicines are efficacious in the cure of cancer is likewise false and misleading. The evidence as a whole does not support the finding of the trial Court that "some it cures, and some it does not cure, and some it relieves somewhat."

We do not attempt to set ourselves up as arbiters of what method of treatment the Hoxsey Clinic shall employ. We are not authorized by law to do so. It is our duty to adjudge the merits of the case in the light of the provisions and intent of the Federal Food, Drug and Cosmetic Act, supra, which close the channels of interstate commerce against drugs which are misbranded. There is no question in this case but that the drugs, with the accompanying labels, were distributed by the defendants in interstate commerce to patients, as well as to Dr. Downs. It is stipulated that one such shipment was made to a patient only a few days before the beginning of the trial. We find these shipments and the accompanying labels to come within the prohibition of the statute and the finding of the trial Court to the contrary to be clearly erroneous.

The facts of the case require the issuance of an injunction, and the Court's failure to do so evidences an abuse of discretion. The judgment of the trial Court is reversed, and the cause remanded with the direction that the trial Court order an injunction to issue as prayed.

Reversed, and remanded, with direction.

12. Sanders v. Leech, 5 Cir., 158 F.2d 486, 487.