UNITED STATES of America, Plaintiff,

v.

ARTICLES OF FOOD AND DRUG consisting of the following: 470 fifty pound bags, more or less, of apricot kernels labeled in part: "Natural Whole & Broken Apricots Packed for Earth Products Marina Del Ray, CA * * * 50 lbs Net Wt" or "Natural Apricot Pieces Packed for Earthco Westlake Village, CA 50 lbs Net Wt", undetermined quantities of amygdalin powder in plastic bags within cardboard boxes labeled in part: "Crude" or "X-1" and "Amygdalin", 2 drums, more or less, each containing approximately 50,000 gelatin capsules labeled in part: "Quantity 50,000 Double O Gelatin, Pre-fit Capsules Parke Davis & Co. Detroit, Mi to Mosinee Research Corp 212 Main St. Mosinee, Wisconsin from: Parke-Davis Capsule Plant, Greenwood, S. C.", and undetermined quantities of articles of food and drug, including raw materials, articles in process of manufacture and finished products, which are labeled with such identification markings or firm or corporation names as are indicative of their manufacture outside the State of Wisconsin or which are otherwise identified as having been shipped in interstate commerce, and Mosinee Research Corp. and U. S. Pharmaceuticals, Inc., corporations, and Albert C. Iwen, Douglas R. Evers, John M. Couture, Joseph J. Birkenstock, and Ralph D. Pennings, Individuals, Defendants.

Civ. A. No. 77-C-285.

United States District Court,
E. D. Wisconsin.

July 29, 1977.

Decision and Order Jan. 20, 1978.

William J. Mulligan, U. S. Atty., by Stephen E. Kravit, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff.

Joseph W. Weigel, Milwaukee, Wis., Henry Rothblatt, New York City, and Kirkpatrick W. Dilling, Chicago, Ill., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

REYNOLDS, Chief Judge.

### FINDINGS OF FACT

1. This is an action filed by the United States of America, pursuant to the provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 332(a), seeking to enjoin defendants from shipping articles containing amygdalin in interstate commerce or holding them for sale after shipment in interstate commerce.

2. The defendants, Mosinee Research Corp. and U. S. Pharmaceuticals, Inc., are corporations organized and existing under the laws of the State of Wisconsin and doing business at 1423 Marshall Street, Manitowoc, Wisconsin, or elsewhere within the jurisdiction of this Court.

3. The defendant Albert C. Iwen, an individual, is president of U. S. Pharmaceuticals, Inc. and president and general manager of Mosinee Research Corp. and performs his duties as such at 1423 Marshall Street, Manitowoc, Wisconsin, or elsewhere within the jurisdiction of this Court.

4. The defendant Douglas R. Evers, an individual, is secretary of U. S. Pharmaceuticals, Inc. and plant superintendent of Mosinee Research Corp. and performs his duties as such at 1423 Marshall Street, Manitowoc, Wisconsin, or elsewhere within the jurisdiction of this Court.

5. The defendant Joseph J. Birkenstock, an individual, is treasurer of U. S. Pharmaceuticals, Inc. and performs his duties as such at 1423 Marshall Street, Manitowoc, Wisconsin, or elsewhere within the jurisdiction of this Court.

6. The defendant Ralph D. Pennings, an individual, is secretary and treasurer of Mosinee Research Corp. and a corporate director of U. S. Pharmaceuticals, Inc. and performs his duties as such at 1423 Marshall Street, Manitowoc, Wisconsin, or elsewhere within the jurisdiction of this Court.

7. The defendant, John M. Couture, is vice president of U. S. Pharmaceuticals, Inc. and the sole proprietor of Product Distributors Co. and performs his duties as such at 1423 Marshall Street, Manitowoc, Wisconsin, and at 13131 West Janesville Road, Hales Corners, Wisconsin, or elsewhere within the jurisdiction of this Court.

8. Defendants produce crude amygdalin in various forms at the U. S. Pharmaceuticals, Inc. plant in Manitowoc, Wisconsin, from raw materials shipped in interstate commerce. (Testimony and affidavits of FDA inspectors Gerald Scholze and John Schrader, Exhibits 44 and 45; depositions of John Couture, p. 13, Karl Birkenstock, p. 17, and Joseph Birkenstock, p. 10; Exhibit 91.)

9. The defendants have sold, shipped, and held for sale after shipment in interstate commerce amygdalin in various forms including ground defatted apricot kernels, powdered, tableted, and injectables, and the components thereof. (Depositions of John Couture, p. 22; Exhibits 2, 3, 8, 9, 13, 14, 25, 26, 40, 55, 71, 72, 73, 91, 92, 94, and 96; Affidavit of Dale Stelter, Exhibit 63; Testimony of Albert C. Iwen.)

10. Analyses of in process substances sampled by FDA investigators April 12, through April 14, 1977, at U. S. Pharmaceuticals, Inc. established that such samples contained amygdalin. (Testimony and affidavits of FDA investigators Gerald Scholze and John Schrader, Exhibits 44 & 45, and FDA Chemical Analysts Keith L. Egli, John G. Meyer, Darryl E. Johnson, John W. Turczan, and James Nelson, Exhibits 46–50.)

11. Samples of apricot kernels stored for Joseph J. Birkenstock at Lube Devices, Inc., 2020 Nagle Avenue, Manitowoc, Wisconsin, collected on April 15, 1977, were found to contain amygdalin. (Affidavits of John P. Hermann and Terry Morse, FDA investiga-

tors, Exhibits 51 and 52; affidavit of Gus J. Lukas, president of Lube Devices; testimony and affidavits of Keith L. Egli and Darryl Johnson, FDA chemists, Exhibits 53 & 54.)

12. Samples of Product Distributors Co. parcel shipments, collected by FDA inspectors on April 19, and April 20, 1977, at United Parcel Service, Elm Grove, Wisconsin, consigned outside the State of Wisconsin, were contained in bottles unlabeled or labeled "100 [or 50] TABLETS AMYGDALIN Gross Weight 650 MG. Ea. Seed Extract 500 MG. Ea. Pure Amygdalin 325 MG. Ea." or "65% Amygdalin Prod. Distr. 50 Tablets 100/150 mg. ea." Tablets contained therein were either unmarked or marked "USPI" on one side and "325/500" on the other and upon analyses were found to contain amygdalin. (Affidavits of FDA investigators June K. Griffiths and Douglas R. Nelson, Exhibits 55 & 56; testimony and affidavits of FDA Chemical Analysts Keith L. Egli, John W. Turczan, and James Nelson, Exhibits 57–59.)

13. On May 6, 1977, a sample of tablets was collected from Mr. Pat Egan (Menominee Herald-Leader), 122 6th Avenue, Menominee, Michigan. Said sample was collected from a plastic container labeled "100 TABLETS AMYGDALIN Gross Weight 650 MG. Ea. Seed Extract 500 MG. Ea. Pure Amygdalin 325 MG. Ea.", containing tablets marked "USPI" on one side and "325/500" on the other. (Affidavits of FDA inspector John Schrader, Exhibit 60.) The tablets contained amygdalin. (Testimony and affidavits of FDA Chemical Analysts Keith L. Egli and John G. Meyer, Exhibits 61 & 62.)

14. On May 16, 1977, FDA investigators, with U. S. Marshals, seized in process materials at the U. S. Pharmaceuticals, Inc. plant in Manitowoc, Wisconsin, including, but not limited to: apricot kernels, an off-white powder, and a tan-colored, granular clumped product which upon analysis contained amygdalin. (Affidavit of June K. Griffiths, Exhibit 66; testimony and affidavits of Keith L. Egli, Terry Hoffman, Mike Cadotte, and Richard D. Thompson, FDA Chemical Analysts, Exhibits 67–70.)

15. On June 29, 1977, a documentary sample of injectable amygdalin shipped by Product Distributors Co. was collected at United Parcel Service, Elm Grove, Wisconsin. The vial of such injectable was labeled "AMYGDALINA CYTO PHARMA 3g. 10 mg. Reg. No. 84954 S.S.A. I.M. – 6 I.V. CYTO PHARMA DE MEXICO, SA." (Exhibit # 39; affidavit of FDA investigator Robert W. Hudson, Exhibit 71.)

16. On or about June 13, 1977, Product Distributors Co. sold and shipped to Dale T. Stelter, FDA investigator, at 608 Baldwin, Waukegan, Ill., 50 tablets in an unlabeled container. The tablets were marked "USPI" on one side and "325/500" on the other and contained amygdalin. (Affidavit of Dale Stelter, Exhibit 63; testimony and affidavits of Keith L. Egli and Mike Cadotte, FDA Chemical Analysts, Exhibits 64 & 65.)

17. Amygdalin is commonly known as Laetrile and also as "Vitamin B–17" (Article entitled "The Vitamin Fraud in Cancer Therapy" by David M. Greenberg, Ph.D., p. 346, attached to affidavit of Dr. Greenberg, Exhibit 18 [hereafter referred to as "Greenberg article"]; testimony of Dr. Victor Herbert, M.D.; testimony of Dr. Jerry Lewis.)

18. "Vitamin B–17" is not a recognized vitamin in human nutrition and has no known nutritional value. (See references for finding 17; also defendants' Response Memorandum, p. 6; affidavit of the University of Wisconsin's College of Agricultural and Life Sciences, Department Faculty, Exhibit 30.)

19. The amygdalin produced and sold by defendants is intended for use in the cure, mitigation, palliation, treatment, and prevention of various forms of human cancer. The defendants and their agents had knowledge of amygdalin's intended use as a drug and defendants and their agents represented amygdalin's intended use as a form of cancer therapy. (Affidavit of Gerald Scholze, Exhibit 74; letter dated December 3, 1976; John Couture to Louis Eghian, Exhibit 2; letter dated September 27, 1976; John Couture to Charles Hotchkiss, Exhibit 4; letter dated December 3, 1976; John Couture to Mr. Robert Benzley, Ex-

hibit 3; letter dated August 9, 1976; John Couture to Mrs. E. L. Haney, Exhibit 5; letter dated October 29, 1976; John Couture to Robert A. Uihlein, Exhibit 6; letter to the Editor of the Dodgeville Chronicle, Dodgeville, Wisconsin, dated April 21, 1977, authored by John Couture, Exhibit 7; unsigned letter dated January 5, 1975, to John Couture, Exhibit 9; deposition of John Couture, pp. 49–50; pamphlet entitled "Metabolic Therapy and Laetrile in Clinical Applications Against Cancer", printed for and distributed by Product Distributors Company, Exhibit 10; correspondence between A. C. Iwen and Walter Ermer dated October 11, 1976, and October 14, 1976, Exhibit 26; testimony of Albert C. Iwen; and the widespread publicity in general generated by the proponents of amygdalin and the controversy at hand.)

20. Defendants have sold and distributed as an integral element of their promotion of "amygdalin", a pamphlet entitled: "Metabolic Therapy and Laetrile in Clinical Applications Against Cancer". (Exhibit 10; affidavit of FDA investigator Robert Hudson, Exhibits 72 & 73.)

21. There has been widespread publicity generated by proponents of Laetrile which has encouraged cancer victims to rely on amygdalin instead of surgery, radiation, and chemotherapy, and other forms of treatment that have established value in cancer management. Misleading claims that amygdalin has some established value have appeared in newspapers, magazines, popular books, promotional films, and the news media. (Defendants' Exhibits 1016 & 1024; Exhibits 71 & 90; testimony of Irving Lerner, M.D., Victor Herbert, M.D., Jerry Lewis, M.D., Samuel Klagsburn, M.D., and Robert Young, M.D., Ph.D.)

22. A representation in the labeling or in the promotion of an article intended for human consumption, that it is or contains amygdalin, is a representation that the article is intended for use in the cure, mitigation, treatment and prevention of cancer in man. (Greenberg Article; see references for finding 21.)

23. Defendants have filed no "new drug application" for amygdalin nor is there an approved "new drug application" on file with H.E.W. (Testimony of Robert Young, M.D., Ph.D.)

24. Samples of the amygdalin produced by defendants which were tested for potency were found to be of significantly lesser strength than represented. [Affidavits of Keith Egli and Mike Cadotte, FDA Analysts: Exhibit 57 showing 42.2%–49.2% of purported strength; Exhibits 64 & 65, showing 70.4%–90% of purported strength; and Exhibit 61, showing 72.3% of purported strength.]

25. Amygdalin is a cyanogenic glucoside which reacts with Beta-glucosidase, an enzyme found in a number of commonly eaten foods, to form hydrogen cyanide, a highly toxic substance. (Affidavits of Thomas H. Jukes, Ph.D., Exhibit 15; Carl M. Leventhal, M.D., Exhibit 16; the American Medical Association by James H. Sammons, M.D., Exhibit 17; David M. Greenberg, M.D., Exhibit 18; Robert Temple, M.D., Exhibit 31; and Jean Taylor, Ph.D., Exhibit 43; testimony of Jerry Lewis, M.D., Irving Lerner, M.D., Robert Young, M.D., and Victor Herbert, M.D.)

26. Due to the presence therein of cyanide, a poisonous and deleterious substance, amygdalin is potentially harmful and ordinarily injurious to health (See references to finding 25; also: Death Certificate of Elizabeth Hankin, Exhibits 11 and 79;)

27. The danger in the use of amygdalin by the public, and in particular by cancer victims, is in delaying and foregoing diagnosis and treatment known to be beneficial and effective. (Testimony of Jerry Lewis, M.D., Irving Lerner, M.D., Robert Young, M.D., Ph.D., Victor Herbert, M.D., and Samuel Klagsburn, M.D.; affidavits of the American Medical Association by James H. Sammons, M.D., Exhibit 17, Carl M. Leventhal, M.D., Exhibit 16, Robert Temple, M.D., Exhibit 31, and Daniel Martin, M.D., Exhibit 32).

28. Amygdalin distributed in interstate commerce by defendants, in any form, failed to bear any warnings or directions for use, or other information connected with its intended use, including dosage, du-

ration, and route and frequency of administration. (See references for findings 12, 13, 15 & 16.)

29. Defendant John M. Couture, d/b/a Product Distributors Co., has sold injectable and tableted amygdalin. (Exhibit 39; affidavit of Robert Hudson, Exhibit 71; deposition of John Couture, p. 63.)

30. Injectable amygdalin is *per se* a prescription drug, as are all drugs for cancer treatment. (Affidavit of Carl M. Leventhal, M.D., Exhibit 41, testimony of Dr. Robert Young.)

31. Amygdalin is not generally recognized by experts, qualified by scientific training and experience to evaluate its safety and efficacy, as safe and effective in the cure, mitigation, treatment, palliation or prevention of cancer in man. (Testimony of Irving Lerner, M.D., Jerry Lewis, M.D., Victor Herbert, M.D., Samuel Klagsburn, M.D., Robert Young, M.D., Ph.D., Harold Manner, Ph.D.; affidavits of Thomas H. Jukes, Ph.D., Exhibit 15, Carl M. Leventhal, M.D., Exhibit 16, the American Medical Association by James H. Sammons, M.D., Exhibit 17, David M. Greenberg, Ph.D., Exhibit 18, Robert Temple, M.D., Exhibit 31, and Daniel Martin, M.D., Exhibit 32.)

32. Amygdalin is not "grandfathered" within the meaning of the Food, Drug, and Cosmetic Act. (Testimony of Robert K. Young, M.D., Ph.D., affidavits of Carl M. Leventhal, M.D., Exhibit 16 and the American Medical Association by James H. Sammons, M.D., Exhibit 17; *amicus curiae* brief entitled "Memorandum of the American Cancer Society".)

33. Anecdotal and testimonial evidence as to cures or effects of treatments on cancer victims as described by lay persons, or persons possessing either an M.D. or Ph.D., but who are not qualified by scientific training and experience as experts in the field of cancer therapy, is not probative or substantial evidence of the safety and efficacy of cancer treatments. (Testimony of Robert Young, M.D., Ph.D., Victor Herbert, M.D., Irving Lerner, M.D., Jerry Lewis, M.D.; affidavits of Thomas H. Jukes, Exhibit 15, the American Medical Association by James H. Sammons, M.D., Exhibit 17,

David M. Greenberg, M.D., Exhibit 18, Robert Temple, M.D., Exhibit 31, and Daniel Martin, M.D., Exhibit 32).

34. None of the defendants are registered with the Department of Health, Education, and Welfare as drug producers. (Affidavits and certificates of T. E. Byers, FDA Bureau of Drugs, Exhibits 29 and 42; Exhibits 1031, 95 and 97; deposition of John Couture, p. 71, and Joseph Birkenstock, p. 52.)

35. The raw materials, the in-process amygdalin, and the final-product amygdalin were prepared, packed, and held under insanitary conditions, whereby they may have become contaminated. (Exhibit 33 [photographs]; testimony of Gerald Scholze, FDA investigator, and Dr. Robert Gerraughty; report from the State of Wisconsin Pharmacy Board dated February 24, 1977, Exhibit 89; Inspectional Observation Form F.D. 483, Exhibit 22.)

36. The defendants' methods used in, and the facilities and controls used for, the manufacturing, processing, packing, and holding of amygdalin and its components, do not conform to and are not operated and administered in conformity with current good manufacturing practices, in that building and equipment is not of suitable design, size, and construction for its intended purpose; production and control procedures are inadequate to assure the safety, identity, strength, quality, and purity of the raw materials, in-process and finished product amygdalin; and master production and control records, as well as batch production and control records, are not maintained (see references for finding 35).

37. Defendants have no quality assurance control over the manufacturing practices involved in the tableting of the amygdalin which they manufacture, process, and distribute in interstate commerce. (Testimony of Albert C. Iwen.)

38. The tableting of defendants' amygdalin is accomplished by their agent, the president and treasurer of Shara Laboratories, Inc. of Wautoma, Wisconsin, James Sommers. (Testimony of Albert C. Iwen.)

39. Due to the presence of cyanide, amygdalin is unfit for consumption as a food

by human beings. (Testimony of Jerry Lewis, M.D., Exhibits 83 & 84; Victor Herbert, M.D., Irving Lerner, M.D., Robert Young, M.D., Ph.D.; affidavits of Thomas H. Jukes, Ph.D., Exhibit 15, Carl M. Leventhal, M.D., Exhibit 16, the American Medical Association by James H. Sammons, M.D., Exhibit 17, David M. Greenberg, M.D., Exhibit 18, Robert Temple, M.D., Exhibit 31, Daniel Martin, M.D., Exhibit 32, Jean Taylor, Ph.D., Exhibit 43; Death Certificate of Elizabeth Hankin, Exhibits 11 & 79;)

40. The promotion or sale of amygdalin for any food or drug use constitutes a fraud on the consuming public. (Testimony of Robert Young, M.D., Ph.D., Irving Lerner, M.D., Jerry Lewis, M.D., Victor Herbert, M.D., and Samuel Klagsburn, M.D.; affidavits of Thomas H. Jukes, Ph.D., Exhibit 15, Carl M. Leventhal, M.D., Exhibit 16, the American Medical Association by James H. Sammons, M.D., Exhibit 17, David M. Greenberg, M.D., Exhibit 18, Robert Temple, M.D., Exhibit 31, and Daniel Martin, M.D., Exhibit 32; *amicus curiae* brief entitled "Memorandum of the American Cancer Society".)

41. Defendants did not hold apricot kernels for any purpose other than for reduction by their manufacturing process and ultimate re-sale as a drug. (Deposition of John Couture, Karl Birkenstock, testimony of Douglas Evers, Albert Iwen, Gerald Scholze.)

42. The following persons and companies have acted as agents and/or distributors, or have acted in concert with defendants in the production, distribution, labeling and/ sale of amygdalin, Laetrile or B–17:

Pioneer Labs
Vita-Corp.
Natural Food Products, Inc.
National Dietary Foods, Inc.
Karl Birkenstock
Gary Couture
Cheri Couture
Lube Devices
Ruth Sackman
Joan Cimone
James Sommers
Rick White

(Deposition of John Couture; Cheri Couture, Exhibit 14; testimony of Albert Iwen.)

## CONCLUSIONS OF LAW

1. This Court has jurisdiction herein under 21 U.S.C. § 334(a) and 21 U.S.C. § 332(a).

2. Amygdalin is a drug within the meaning of 21 U.S.C. § 321(g) and 21 C.F.R. 201.128 since it is intended for use in the cure, mitigation, treatment and prevention of cancer in man.

3. Amygdalin is an unapproved new drug within the meaning of 21 U.S.C. § 321(p).

4. The amygdalin produced by defendants is a misbranded drug in that its labeling bears inadequate direction for use within the meaning of 21 U.S.C. § 352(f)(1).

5. Since it is dangerous to health when used in the dosage or manner suggested, the amygdalin produced by defendants is misbranded within the meaning of 21 U.S.C. § 352(j).

6. Failure of defendants to validly register as drug manufacturers causes the amygdalin to be a misbranded drug within the meaning of 21 U.S.C. § 352(*o*).

7. Because of its toxicity and potential for harmful effect, the amygdalin produced by defendants is a prescription drug and, since its label fails to bear the statement "Caution: Federal Law prohibits dispensing without prescription", it is misbranded within the meaning of 21 U.S.C. § 353(b)(1) and (b)(4).

8. The amygdalin produced by defendants was prepared, packed, and held under insanitary conditions and not manufactured in conformity with current good manufacturing practices, and is therefore an adulterated drug within the meaning of 21 U.S.C. § 351(a)(2)(A) and (B).

■ 9. The strength of the amygdalin produced by defendants differs from that which it purports or is represented to possess and the amygdalin is therefore an adulterated drug within the meaning of 21 U.S.C. § 351(c).

■ 10. Amygdalin in any form contains cyanide, a poisonous and deleterious substance, which is ordinarily injurious to health and otherwise unfit for food, and is therefore an adulterated food within the meaning of 21 U.S.C. § 342(a)(1) and (3).

■ 11. The amygdalin produced by defendants has been prepared, packed and held under insanitary conditions whereby it may have become contaminated and is therefore an adulterated food within the meaning of 21 U.S.C. § 342(a)(4).

■ 12. The defendants violate 21 U.S.C. § 331(a) and (d) when they deliver for introduction, or introduce into interstate commerce, the article "amygdalin" which is adulterated, misbranded, and which is a new drug for which no approval of a new drug application is effective.

■ 13. The defendants violate 21 U.S.C. § 331(k) when they hold misbranded or adulterated "amygdalin" for sale after shipment of the article or its components in interstate commerce.

■ 14. The defendants violate 21 U.S.C. § 331(p) when they produce drugs without registering in accordance with 21 U.S.C. § 360.

■ 15. The testimony of lay witnesses as to the existence of cancer and the safety and efficacy of an alleged cancer treatment based on their personal experience with the treatment is entitled to no weight and is therefore inadmissible as irrelevant and non-probative evidence. *United States v. Hoxsey Cancer Clinic*, 198 F.2d 273 (5th Cir. 1952) *and United States v. Wier*, 281 F.2d 850 (5th Cir. 1960); Federal Rules of Evidence, 401, 402, 403, 701.

16. Any Finding of Fact which might be deemed to be a Conclusion of Law is hereby incorporated in these Conclusions of Law.

17. Plaintiff is entitled to a Preliminary Injunction.

## DECISION AND ORDER

On May 16, 1977, the plaintiff United States of America filed a complaint in this action seeking in Count I a libel of seizure and condemnation against certain articles of food or drug containing amygdalin, pursuant to § 304 of the Federal Food, Drug, and Cosmetic Act, as amended, 21 U.S.C. § 334, and seeking in Count II preliminary injunctive relief against the manufacturers of such articles of food or drug and their agents and distributors to restrain alleged violations by them of the Federal Food, Drug, and Cosmetic Act, pursuant to 21 U.S.C. § 332. Such articles of food or drug were seized by the plaintiff United States on libel of information on May 16, 1977. On July 29, 1977, following a hearing on plaintiff's motion for preliminary injunctive relief on Count II of the complaint, as amended on May 26, 1977, the Court issued findings of fact and conclusions of law and a preliminary injunctive decree which, inter alia, restrained the defendants from manufacturing, distributing, or introducing into interstate commerce any article of food or drug containing amygdalin, and required the defendants to turn over to the United States Marshal all articles of food or drug containing amygdalin, then within their possession or control.

Thereafter on August 2, 1977, plaintiff moved the Court for "Summary Judgment of Condemnation" as to the articles of food or drug seized on May 16, 1977, which motion the Court has construed as a motion for partial summary judgment, i.e., as to Count I of the amended complaint. (See decision and order dated December 1, 1977, in C. A. No. 77–C–285.) On August 29, 1977, defendants filed a notice of appeal of the decree of preliminary injunction to the Court of Appeals for the Seventh Circuit. For the reasons hereafter stated, plaintiff's motion for summary judgment will be denied.

Plaintiff contends that it is entitled to summary judgment of condemnation as to

the articles seized on May 16, 1977, based on the findings of fact and conclusions of law entered by the Court in this action on July 29, 1977, as well as on certain admissions of the defendants made at the preliminary injunction hearing and in depositions.

While the decree of preliminary injunction was entered by this Court on Count II of the amended complaint, and the motion for summary judgment relates to Count I, nevertheless the two counts are intertwined and the Government is asking the Court to make its ruling on the merits of Count I based primarily on evidence adduced in support of a preliminary decree in Count II. The decree of preliminary injunction has been appealed and, therefore, the merits of the decree are within the control of the Court of Appeals for the Seventh Circuit which may review not only the terms of the decree but also the findings of fact and conclusions of law entered at the close of the hearing.

This Court should refrain from taking any action in derogation of the jurisdiction of the Court of Appeals. *Armstrong v. O'Connell,* 416 F.Supp. 1325, 1329 (E.D.Wis.1976). Given the interrelation between Counts I and II of the amended complaint in this action, while technically this Court may have jurisdiction to make a final ruling on the merits of Count I, see, e.g., *Janousek v. Doyle,* 313 F.2d 916, 921 (8th Cir. 1963); *Nalco Chemical Company v. Hall,* 347 F.2d 90 (5th Cir. 1965), it should refrain from so doing pending a decision by the court of appeals on the appeal taken from this Court's ruling in Count II.

For the foregoing reasons,

IT IS ORDERED that the motion of the plaintiff United States of America for summary judgment of condemnation is denied at this time without prejudice to the plaintiff's renewing the motion, if it is appropriate, after the Seventh Circuit Court of Appeals decides the appeal taken on Count II.