# Custody of a Minor (No. 3).

Plymouth.   May 24, 1979. — August 9, 1979.

Present: Hennessey, C.J., Braucher, Kaplan, Wilkins, & Liacos, JJ.

*Jurisdiction,* Care and protection of minor. *Minor,* Medical treatment. *Parent and Child,* Consent to medical treatment, Care and protection of minor.

Discussion of principles relevant to a determination whether a child is in need of care and protection under G. L. c. 119, § 26. [743-745]

In a proceeding under G. L. c. 119, § 26, there was sufficient evidence to warrant findings that metabolic therapy administered by parents to a child suffering from acute lymphocytic leukemia was both medically ineffective in treating the child's condition and detrimental to the child's health, and the judge's findings were sufficiently specific to support his conclusion that the child was in need of care and protection under § 26. [745-748] Braucher, J., dissenting on the ground that the appeal should be dismissed because the parents left the Commonwealth with the child, in violation of the trial court's orders.

Petition filed in the Superior Court Department on November 6, 1978.

The case was heard by *Volterra,* J., a District Court judge sitting under statutory authority.

The Supreme Judicial Court granted a request for direct appellate review.

*George Donovan* for the petitioners.

*Jonathan Brant,* Assistant Attorney General (*John Graceffa* with him) for the Department of Public Welfare.

*John H. Wyman* for the minor.

Hennessey, C.J. This is a petition by the parents of a three year old boy for a review and redetermination of the child's needs for care and protection under G. L. c. 119, § 26. The child has the disease of acute lymphocytic leukemia. After a hearing, a judge in the Superior

Court continued in effect a prior court order, issued on April 18, 1978, requiring that the child undergo chemotherapy treatments. The judge further ordered that the parents cease administering to the child laetrile, large doses of vitamins A and C, enzyme enemas, and folic acid. The parents' custody of the child was restricted only to the extent necessary to ensure medical supervision consistent with the order. The parents appealed. We affirm the judgment.[1]

1. *Prior Proceedings.*

This matter was before this court once before. *Custody of a Minor*, 375 Mass. 733 (1978). On that occasion there had been an appeal to the Superior Court from the dismissal in District Court of a care and protection petition brought by the child's attending physician pursuant to G. L. c. 119, § 24. The filing of that petition followed the parents' refusal to consent to the continued administration of chemotherapy treatment. On April 18, 1978, after a hearing, a judge in the Superior Court found the minor to be in need of care and protection within the meaning of G. L. c. 119, § 24, and issued an order which, inter alia, required the parents to allow the child to undergo chemotherapy treatment under the supervision of any board certified pediatric hematologist of the parents' choosing within the Commonwealth, and which vested legal custody of the child in the Department of Public Welfare (department), for the limited purpose of ensuring that such medical treatment was administered. On appeal to this court, we affirmed the Superior Court order.

The essence of the matter then before us was that the child was suffering from acute lymphocytic leukemia for which he was then undergoing a long course of chemotherapy and, by September 30, 1977, the disease was in

[1] This court was informed at oral argument that the parents have left the Commonwealth with the child, in violation of the trial judge's orders. It could be argued that the parents thus have no standing to appeal, but no party pressed that point before us. We pass the issue, particularly since a small child is concerned.

a state of remission. Thereafter, the parents, without the knowledge of the attending physician, discontinued the child's medication. By February of 1978, the disease had recurred. When the parents declined to resume the treatments, the physician, Dr. Truman, sought the assistance of the courts.

In deciding the case we stated, *"Essentially, the judge's findings, which we affirm here, are that there is a substantial chance for a cure and a normal life for the child if he undergoes chemotherapy treatment. The uncontradicted medical testimony supports those conclusions, and no evidence of any alternative treatment consistent with good medical practice was offered."* Custody of a Minor, *supra* at 736. We observed (*id.* at n.1), that it was only in their brief on appeal that the parents made any attempt to prove the existence of effective alternative treatment programs for children suffering from leukemia. Some statements were made before this court on appeal as to the attributes of the drug popularly known as laetrile but no evidence of this nature was offered or mentioned in the trial proceedings, and it was, of course, not properly before this court.

*2. The Present Proceeding.*

In the instant case the parents have petitioned the court for a review and redetermination of the current needs of their child. It is their privilege to request such a proceeding not more than once every six months. G. L. c. 119, § 26. A hearing was held in January, 1979, before a judge in the Superior Court. The Attorney General appeared for the department and court-appointed counsel appeared as guardian ad litem for the child. The guardian ad litem supported the department's position that the chemotherapy should be continued and that the parents should be prevented from administering additional and harmful treatment to the child. We summarize below the judge's findings of fact.

At the hearing the parents made it clear, for the first time, that they now accept the necessity of having their

child receive chemotherapy treatment. By their petition they sought legal authority to supplement the chemotherapy with a program of "metabolic therapy" involving the daily administration of enzymes, large doses of vitamins, and the drug amygdalin, more popularly known as laetrile. They also sought to retain full custody of their child, free and clear of the order from the prior proceeding which placed limited custody in the department for the supervision of the child's medical treatment only.

The hearing was devoted largely to expert testimony concerning the safety and efficacy, or lack thereof, of the proposed metabolic therapy. The parents presented four expert witnesses. None is licensed to practice medicine in this Commonwealth. None claimed expertise, or even experience with, the treatment of blood diseases in general or leukemia in particular. Dr. Ernesto Contreras was educated and is licensed in Mexico; he spent two years at the Sydney Farber Institute in Boston studying diagnostic pathology and oncology; he is a physician and board certified pathologist; since 1963 he has run a cancer clinic in Tijuana, at which metabolic therapy frequently is used. Dr. Bruce Halstead is also a physician and an expert in biological poisons; he received his medical degree in California, and is currently medical director of a California clinic devoted to the treatment of chronic degenerative diseases at which metabolic therapy has been administered since 1977. The other two experts presented by the parents are not physicians. Dr. Harold Manner is a biologist, and is chairman of the biology department at Loyola University in Chicago, where he has conducted laboratory experiments with laetrile for six years. Dr. Dean Burk is a biochemist and president of an organization devoted to cancer research, and for thirty-five years was the head of cytochemistry at the National Cancer Institute.

The department presented five expert witnesses all of whom are physicians, and all include, among their specialities, the study and treatment of blood diseases. Three practice medicine in this Commonwealth. Dr. John

Truman is a pediatric hematologist and oncologist; he is currently chief of the pediatric hematology unit at Massachusetts General Hospital; he has been the child's treating physician since the parents brought their son to Boston. Dr. Emil Frei was a cofounder of the Leukemia Group B, an organization devoted to collaborative research on leukemia, and is currently the director of the Sydney Farber Cancer Institute. Dr. Andrew Cederbaum is the chief of the hematology and oncology divisions at Memorial Hospital in Worcester. The other two physicians presented by the department were Dr. Robert Young, who is presently the chief medical officer for anticancer drugs at the Food and Drug Administration, and Dr. Victor Herbert, who currently runs the division of hematology and nutrition at Bronx Veterans' Administration Hospital in New York.

The judge found that the child's leukemia, which had reappeared in February of 1978, following the parents' cessation of the chemotherapy and which had been brought into remission again following the court-ordered resumption of the treatment, has remained in remission ever since. The chemotherapy regimen is currently in the final, maintenance phase, which consists of the administration of Prednisone, Vincristine, Methotrexate, and 6-Mercaptopurine according to regular schedules. The drugs are administered at home in pill form by a visiting nurse. The child also visits Massachusetts General Hospital every fortnight for checkups and tests.[2] The maintenance phase is scheduled to last for approximately two more years.

Had the chemotherapy treatment not been terminated, and had there been no recurrence of the leukemia, such that the child had remained in remission for one and one-half years following initiation of the chemotherapy,

---

[2] We reiterate that this is a summary of the judge's findings, and they speak as of the time of the hearing before him. Obviously, the child's routine is vastly different at the present time.

his chances of being completely cured would now have been approximately eighty per cent. The fact that the disease did return renders this estimate inapplicable to the present situation. However, because the child has remained in remission for approximately one year following the resumption of the chemotherapy, his chances of cure are now close to fifty per cent.

At the previous hearing, the judge found that the child had not suffered many of the adverse side effects typically associated with the chemotherapeutic drugs, and that the discomforts that had been experienced — such as constipation and stomach cramps — could be alleviated by adjusting the dosages of medication. The judge found that no new evidence has been presented that would alter these conclusions.

The judge further found that in late April, 1978, without informing the child's attending physician and with no other supervision, the parents began administering metabolic therapy to the child and have continued to do so ever since. The daily metabolic regimen consists of the following: one 500 milligram tablet of laetrile taken orally, half in the morning and half at night; an enzyme enema involving one Wobe-Mugos tablet dissolved in an ounce of water, each tablet containing 100 milligrams of papagotin, 80 milligrams of beef pancreas, 40 milligrams of calf thymus, and 100 milligrams of excipients; 45,000 units of vitamin A, divided into thirds and mixed with juice; 3,500 to 4,000 milligrams of vitamin C, administered as powder in juice; one 1.0 milligram tablet of folic acid; one 650 milligram tablet of calcium lactate; and two tablets of mineral supplements called Seroniums.

In late September, 1978, the treating physician, Dr. Truman, learned from the press that the child was receiving this metabolic therapy. He immediately conveyed to the parents his opinion that the metabolic components were potentially dangerous, adding specifically that laetrile contained cyanide. Furthermore, at the child's next scheduled visit to the hospital, on October 9, 1978, Dr.

Truman ordered blood tests performed to check for possible cyanide and vitamin A poisoning. These tests satisfied him that the child was in no danger of acute poisoning. He remained concerned, however, about the possibility of chronic, long-term poisoning, and had these blood tests repeated on November 27, 1978.

Laetrile is a chemical compound occurring in natural form in apricot and peach pits, bitter almonds, and numerous other plant materials.[3] It is composed of two molecules of glucose and one molecule of mandelonitrile — a chemical in which cyanide is combined with benzaldehyde. Laetrile is six per cent cyanide by weight. So long as the cyanide radical remains attached to the benzaldehyde, it is nontoxic. However, laetrile is broken down by beta-glucosidase, an enzyme found in a number of commonly eaten foods, particularly plant foods, to form a molecule of benzaldehyde and a molecule of hydrogen cyanide. The latter is a highly toxic substance.

The proponents of laetrile have made a number of claims concerning the use of this substance. Other proponents make no claims concerning the use of laetrile alone, but contend that the metabolic therapy combining laetrile, proteolytic enzymes and megadoses of vitamin A has curative effects in cancer treatment.

After weighing all of the evidence proffered on this issue, the judge found that neither laetrile alone nor the combined metabolic therapy has any curative or ameliorative effect in the treatment of cancer in general or acute lymphocytic leukemia in particular.

Although two experts presented by the parents, Drs. Burk and Manner, supported metabolic therapy's alleged efficacy in some cancer treatment, all four of the parents' experts agreed that laetrile and metabolic therapy have

---

[3] The Commissioner of the United States Food and Drug Administration issued an opinion (42 Fed. Reg. 39768 [1977]) that no uniform definition of laetrile exists; rather the term has been used generically for chemical compounds similar to, or consisting at least in part of, amygdalin, a glucoside present in the seeds or kernels of most fruit.

no observable effect in curing acute lymphocytic leukemia. Dr. Contreras said he could make no claim that metabolic therapy has any specific action against leukemic cells. Dr. Manner conceded that the type of localized treatment involved in his experiments is inapposite to the systemic treatment needed to combat nontumorous cancers in humans, and admitted that metabolic therapy has had little success in treating leukemia. According to Dr. Halstead, laetrile has had relatively poor results in leukemia treatment; according to Dr. Burk, metabolic therapy does not assist at all in the cure of this disease.

In addition, the parents' experts unanimously claim that laetrile has a palliative effect and offers various subjective benefits for cancer victims when used in conjunction with chemotherapy. They ascribe to laetrile some sort of detoxification effect which improves a patient's tolerance for chemotherapy and increases his or her appetite, energy level and general sense of well-being. Dr. Contreras, for example, stated that sixty-five per cent of his patients receiving metabolic therapy showed subjective improvement, and Dr. Halstead reported similar signs of improved well-being among his patients.

The judge further found that not only are the assertions concerning metabolic therapy's alleged palliative effect unconfirmed by any well-documented evidence, but there are several alternative explanations for this observed phenomenon. In many of these instances, for example, the commencement of metabolic therapy was accompanied by the cessation of chemotherapy. A temporary improvement in the patient's sense of well-being would be expected in such cases because of the elimination of the possible adverse side effects associated with the chemotherapy treatment. In addition, much of the perceived palliative effect of metabolic therapy is undoubtedly attributable to the so called "placebo effect" — a psychogenic response deriving essentially from human susceptibility to the power of positive suggestion. A placebo effect could hardly be expected to occur in a three year old child.

In any event, no new evidence was presented to alter the factual finding made at the previous hearing that the child is suffering few of the adverse side effects typically associated with chemotherapy. Consequently, the judge found that even if metabolic therapy had a well-documented palliative effect, there would be little need here to administer laetrile in the hope of gaining such benefits.

The judge found, moreover, that each major element of the proposed metabolic regimen poses a serious risk of harm to the child.[4]

The use of laetrile is potentially harmful to the child in three respects. First, the quality of the laetrile that is generally available in this country is poor. The drug is not routinely subjected to testing for quality and purity by the Food and Drug Administration, and as a result, much of it is contaminated by bacteria and fungi and is of varying and uncertain strength. Second, there is a possibility that laetrile might compromise the effectiveness of the chemotherapy treatments. Although there are no studies confirming this fear, neither are there any dispelling it. Third, and of greatest significance, is the possibility of acute or chronic cyanide poisoning arising from the daily ingestion of laetrile.

There was no evidence in this proceeding that the child is in danger of acute cyanide poisoning. However, the daily administration of a substance producing hydrogen cyanide can lead to chronic cyanide poisoning. Notwithstanding the body's detoxification mechanism, the continued ingestion of nonlethal doses of hydrogen cyanide can cause progressive damage to the brain and nervous system and eventually lead to blindness, deafness, an inability to walk, and an enlargement and malfunction of the thyroid gland.

---

[4] The judge made no order concerning three other components of the regimen the parents had chosen for the child — calcium lactate, mineral supplements and a vegetarian diet — since there was no evidence that these were interfering with the chemotherapy or otherwise seriously impairing or endangering the child's health.

The judge found that laetrile is more toxic when administered orally, as it has been in this case, than intravenously, and that the child is currently suffering from low-grade chronic cyanide poisoning as a result of his exposure to laetrile.

The second major component of the metabolic therapy being given to the child is vitamin A, administered in megadoses far in excess of the recommended daily allowance. There are no well controlled scientific studies establishing that the use of vitamin A other than what is needed for normal human nutrition has any curative or palliative effect in the treatment of cancer. In addition, large doses of vitamin A can lead to a condition known as hypervitaminosis A, in either acute or chronic form, which threatens the health of the recipient by causing progressive damage to − and eventual destruction of − the liver; it is characterized by damage to the central nervous system and a particular increase in the intracranial pressure from the spinal fluid. In infants this can lead to an abnormal enlargement of the head known as hydrocephalus, and in older children to pressure on the optic nerve and possible brain destruction.

The early symptoms of vitamin A poisoning include bone tenderness, irritability, headache, weight and hair loss, enlargement of the liver and abnormality of the liver functions. These symptoms typically appear no sooner than seven to ten months after the initial administration of megadoses of vitamin A. Although the reported increase in instances of irritability on the part of the child raises the possibility of hypervitaminosis A, the child is not at this time displaying any of these symptoms. However, the judge found that the level of vitamin A in the child's blood, as measured in November, 1978, and January, 1979, conclusively establishes that the child is currently suffering from hypervitaminosis A. There are also indications of a progressive impairment of the child's liver function, although, unlike the vitamin A levels, this cannot conclusively be attributed to the megadoses of

vitamin A. Nevertheless, the strong correlation in time between the vitamin A use and the liver impairment is highly indicative of a connection between the two.

The judge further found that the remaining major components of the metabolic therapy are also of no value in the treatment of cancer and potentially injurious to the child.

There are no well controlled studies establishing that the use of enzymes, administered either orally, intravenously, or anally, is of any value in the treatment of cancer. Moreover, a daily enzyme enema, as is being given to the child here, poses a serious risk of harm. The parents have been using Wobe-Mugos tablets, which are a German preparation composed of several proteolytic enzymes capable of digesting protein. One of the enzymes — pancreatin — is able to digest 320 times its weight of any tissue into which it is ingested. Papain, another of the enzymes, is a main ingredient in a commercially available meat tenderizer. When these substances are injected into a child's colon, there is a danger that the colon cells, which are themselves protein, will be digested, thereby opening small holes in the intestinal walls. Through these holes could leak protein molecules capable of causing allergic reaction. Even more dangerous would be the possible leakage of bacteria and the resulting incurrence of bacterial infection. The judge found that this could pose a serious risk to the health of the child here, whose capacity to fight infection has been diminished by the leukemia and the chemotherapy treatments.

Folic acid, which is one of the vitamin B complex, has a fair degree of toxicity. More significantly, folic acid can potentially interfere with the effectiveness of Methotrexate, which essentially is an antifolic agent. Dr. Contreras, one expert produced by the parents, acknowledged that the administration of folic acid to a cancer victim theoretically could help to spread the disease.

Finally, the judge found that excessive doses of vitamin C have toxic effects, particularly on the kidneys, in addi-

tion to the potential for causing cancer. The child's vitamin C level was not measured due to the complexity of the test involved.

3. *Relevant Principles.*

The principles governing this case are set out fully in our prior opinion concerning this child. *Custody of a Minor*, 375 Mass. 733, 737, 747-749 (1978). We summarize those principles below. Basically they place three sets of interests in competition: the natural rights of the parents, the responsibilities of the State, and the best interests of the child.

While *recognizing that there exists a private realm of* family life which the State cannot enter, *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944), we think that family autonomy is not absolute, and may be limited where, as here, it appears that parental decisions will jeopardize the health or safety of a child. *Custody of a Minor (No. 1)*, 377 Mass. 876 (1979). *Wisconsin* v. *Yoder*, 406 U.S. 205, 234 (1972).

It is well settled that parents are the "natural guardians of their children . . . [with] the legal as well as moral obligation to support . . . educate" and care for their children's development and well-being. *Richards* v. *Forrest*, 278 Mass. 547, 553 (1932). See *Purinton* v. *Jamrock*, 195 Mass. 187, 199 (1907). As such, it is they who have the primary right to raise their children according to the dictates of their own consciences. See *Quilloin* v. *Walcott*, 434 U.S. 246, 255 (1978), quoting from *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944). *Pierce* v. *Society of Sisters*, 268 U.S. 510, 535 (1925). *Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923). Indeed, these "natural rights" of parents have been recognized as encompassing an entire private realm of family life which must be afforded protection from unwarranted State interference. *Quilloin* v. *Walcott, supra. Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 842 (1977), and cases cited. In light of these principles, this court and others have sought to treat the exercise of parental prerogative

with great deference. See, e.g., *Richards* v. *Forrest, supra* at 556; *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972).

It is also well established, however, that the parental rights described above do not clothe parents with life and death authority over their children. See *Prince* v. *Massachusetts*, 321 U.S. 158, 166-167 (1944). This court has stated that the parental right to control a child's nurture is grounded not in any absolute property right which can be enforced to the detriment of the child, but rather is akin to a trust, subject to a correlative duty to care for and protect the child, and terminable by the parents' failure to discharge their obligations. *Richards* v. *Forrest, supra* at 553. *Purinton* v. *Jamrock, supra* at 201. *Donnelly* v. *Donnelly*, 4 Mass. App. Ct. 162, 164 (1976). Thus we have stated that where a child's well-being is placed in issue, it is not the rights of parents that are chiefly to be considered. The first and paramount duty is to consult the welfare of the child. *Purinton* v. *Jamrock, supra* at 199.

The standard to be applied in such circumstances is articulated in G. L. c. 119, § 24. Pursuant to this provision, a child may be taken from the custody of his parents on a showing that the child is without necessary and proper physical care and that the parents are unwilling to provide such care. The essential inquiry involves application of the "substituted judgment" or "best interests of the child" principles, as more fully discussed *infra*. On a proper showing that parental conduct threatens a child's well-being, the interests of the State and of the individual child may mandate intervention.

Because we are dealing with a child, we find little relevance in arguments which posit the existence of a fundamental right in competent adults to make personal health care decisions and to choose or reject medical treatment, whether orthodox or unorthodox, rational or foolish. We appreciate that the law presently appears to impose certain limitations on such rights in competent adults, and express no opinion as to whether there is such

unfettered freedom of choice arising from the constitutional right of privacy and the right of bodily integrity (compare *Roe* v. *Wade*, 410 U.S. 113, 153 [1973]; *Eisenstadt* v. *Baird*, 405 U.S. 438, 453 [1972]; *Skinner* v. *Oklahoma*, 316 U.S. 535, 541 [1942]), or whether such freedom of choice might be deemed a logical extension of the right to refuse life-prolonging and life-saving medical care in appropriate circumstances. Cf. *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728 (1977); *Lane* v. *Candura*, 6 Mass. App. Ct. 377 (1978).

Even were we to assume that competent adults have the right to use controversial treatments without limitation, we are dealing here with a three year old child. The parents do not — and indeed cannot — assert on their own behalf the privacy rights of their child. *Custody of a Minor*, 375 Mass. 733, 749 n.9 (1978). On the other hand, the child's own rights of privacy and bodily integrity are fully recognized in principles set out in this opinion. "[T]he State must recognize the dignity and worth of [an incompetent] person and afford to that person the same panoply of rights and choices it recognizes in competent persons." *Saikewicz*, *supra* at 746. Such respect is manifested by use of the "substituted judgment" doctrine, according to which a court must seek to identify and effectuate the actual values and preferences of the incompetent individual. *Id.* at 750-753. In the case of a child, however, the substituted judgment doctrine and the "best interests of the child" test are essentially coextensive, involving examination of the same criteria and application of the same basic reasoning. *Custody of a Minor, supra* at 752-753.

4. *Application of Principles.*

In affirming the judgment here, we have determined that the judge's findings are supported by the evidence, that the judgment is supported by the findings, and that there is no error of law. In appraising the judge's findings we have determined that they are in the meticulous detail which is now required to warrant a court's intrusion

into the custody of a child, as between State and parents, under the "care and protection" statutes. See *Custody of a Minor (No. 1)*, 377 Mass. 876, 884-886 (1979). See also *Custody of a Minor (No. 2), ante* 712, 722 (1979).

The result reached by the judge was clearly warranted, and probably required, on the evidence before him. The sum of his findings is that none of the metabolic components, either alone or in conjunction, has any curative or ameliorative effect in the treatment of acute lymphocytic leukemia. The most that any witness claimed for these substances is that they might help to ease the effects of chemotherapy, or they might have a psychological or placebo effect, but even these claims are totally negated by the fact that the chemotherapy for this child has proceeded with minimum side effects, and the placebo impact on a three year old is clearly nonexistent.

In addition, the daily ingestion of laetrile has afflicted the child with low-grade chronic cyanide poisoning with the attendant risk of progressive damage to the brain and nervous system. The megadoses of vitamin A have caused a condition of hypervitaminosis A and are the likely source of the measured impairment of the child's liver function. The administration of enzyme enemas poses a risk of intestinal damage and consequent infection. Folic acid and megadoses of vitamin C have potentially toxic effects, and the folic acid can interfere with the effectiveness of the chemotherapy treatments.

Evidence supporting these findings was ample, as supplied by the expert witnesses introduced by the department. The testimony of the expert witnesses introduced by the parents in no important respect contradicted the department's evidence. Indeed, in some major respects, the parents' expert witnesses corroborated the department's position.

Faced with the facts that metabolic therapy was not only medically ineffective but was poisoning the child, the judge inescapably concluded that the treatment was not consistent with good medical practice (see *Custody of*

*a Minor, supra* at 756 n.13) and, most important, was contrary to the best interests of the child.

These conclusions in turn justified the finding of the judge that the child is without necessary and proper physical care and that the parents are unwilling to provide that care within the meaning of G. L. c. 119, § 24.

It is of some relevance, and somewhat supportive of the result of this case, that several courts have held that laetrile is a "new drug" under the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-392 (1976) — and thus eligible for marketing only after the filing and approval of a new drug application —because it falls within the statutory definition of a "drug [that] is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling." *Id.* § 321 (p) (1).[5] It is also germane that the Supreme Court has decided that the Federal Food, Drug, and Cosmetic Act precludes even terminally ill cancer patients from obtaining laetrile. *United States* v. *Rutherford*, 442 U.S. 544 (1979).

We are not deciding whether metabolic therapy, including the use of laetrile, is generally or sometimes effective in the treatment of cancer. This case is concerned only with the specific disease which afflicts this child, and is decided only on the evidence presented in this case. It would be presumptuous for this court to speak too broadly or too confidently as to medical theories advanced by some, particularly since they relate to the dread disease

---

[5] E.g., *United States* v. *Spectro Foods Corp.*, 544 F.2d 1175, 1179-1180 (3d Cir. 1976); *United States* v. *Articles of Food & Drug*, 444 F. Supp. 266, 271-273 (E.D. Wis.), aff'd sub nom. *United States* v. *Mosinee Research Corp.*, 583 F.2d 930 (7th Cir. 1978); *Gadler* v. *United States*, 425 F. Supp. 244, 247 (D. Minn. 1977); *Hanson* v. *United States*, 417 F. Supp. 30, 36 (D. Minn.), aff'd 540 F.2d 947 (8th Cir. 1976); *United States* v. *General Research Laboratories*, 397 F. Supp. 197, 198-199 (C.D. Cal. 1975). See Note, Laetrile: Statutory and Constitutional Limitations on the Regulation of Ineffective Drugs, 127 U. Pa. L. Rev. 233 (1978).

of cancer. Indeed, a few other courts have reached results supportive of the use of laetrile, but on evidence which is sharply distinguishable from this case. In *Suenram* v. *Society of Valley Hosp.*, 155 N.J. Super. 593 (1977), the court enjoined a private hospital from refusing the request of a cancer patient to be treated with laetrile by her licensed physician, but the court there was dealing with a competent adult, seventy-eight years old, who had an estimated one month to live and who had undergone full chemotherapy treatment to no avail.

In *In re Hofbauer*, 47 N.Y.2d 48 (1979), the New York Court of Appeals decided that there was no error in a trial court determination that a child suffering from Hodgkin's disease whose parents failed to follow the recommendation of an attending physician to have their child treated by radiation and chemotherapy, but rather placed their child under the care of physicians advocating nutritional or metabolic therapy (including injections of laetrile), was not a neglected child within the meaning of the controlling statute. The medical evidence in that case was sharply conflicting, with two physicians opining that there had been a progression of the disease and denouncing nutritional therapy as ineffective. However, there was also evidence from two other physicians that nutritional therapy is effective and further testimony from an attending physician that the nutritional treatment being administered to the child was controlling his condition and that conventional treatment would be utilized if necessary. In short, there was substantial evidence, even though contradicted by other evidence, to warrant the trial judge's decision. This is a far cry from the unsupported stance of the parents in the instant case, and the compelling evidence that for this child metabolic therapy, including the use of laetrile, is useless and dangerous.

5. *Conclusion.*

It is with sadness that we review the entire history of this case. The child's disease under chemotherapy treatment has been in constant remission except for a period

of months when the parents, without knowledge of the attending physician, discontinued the medication. Only after the first Superior Court hearing was completed, and was on appeal, did the parents make any mention of laetrile.

Now the parents concede that chemotherapy must be continued, but they persist in their support of metabolic therapy, including laetrile, despite the proof that this regimen is not only useless but dangerous for their child.

This is not a case where, in either of the two hearings, conflicting testimony was weighed as to the merits of contesting theories or opinions. The evidence in the first hearing supportive of chemotherapy as the sole hope for amelioration or cure of the disease was undisputed. Likewise, in the second hearing, the evidence was essentially uncontested that metabolic therapy for this child is useless and dangerous. The decisions entered after both hearings were supported by convincing, even overwhelming, evidence.

The judgment of the parents has been consistently poor, from the child's standpoint, and his well-being seriously threatened as a result. Their persistence in pursuing for their child a course against all credible medical advice cannot be explained in terms of despair of a cure, or by the suffering of serious side effects of chemotherapy. The chance for cure with chemotherapy is good; the side effects of chemotherapy in his case have been minor and readily controllable. The parents' actions must be viewed with compassion, but beyond doubt their poor judgment has added immeasurably and unnecessarily to their difficulties, and to those of the child.

This case well illustrates that parents do not and must not have absolute authority over the life and death of their children. Under our free and constitutional government, it is only under serious provocation that we permit interference by the State with parental rights. That provocation is clear here. It is beyond argument that a drug or course of treatment is unsafe if its potential for

inflicting death or physical injury is not offset by the possibility of therapeutic benefit. See *United States* v. *Rutherford*, 442 U.S. 544, 555-556 (1979). The position of the parents in this case, however well intentioned, is indefensible against the overwhelming weight of medical evidence.

*Judgment affirmed.*

BRAUCHER, J. (dissenting). In my view this appeal should be dismissed because, as the court notes (*supra* note 1), the parents have left the Commonwealth with the child, in violation of the trial court's orders. *Ellis* v. *Doherty*, 334 Mass. 466 (1956). *Henderson* v. *Henderson*, 329 Mass. 257 (1952). See *Pur-Shahriari* v. *Pur-Shahriari*, 355 Mass. 632, 633 (1969). Cf. *Commonwealth* v. *Andrews*, 97 Mass. 543 (1867) (criminal appeal). I would raise the point on the court's own motion, looking to the merits only to the extent necessary to be sure that the interests of the child were adequately represented by the guardian ad litem. They were. My view is reinforced by the fact that the presentation of the appeal on behalf of the parents was quite summary.

Since none of my brethren shares my view, I think it is proper to state that I do not disagree with the court's conclusion on the merits.